# In the United States Court of Appeals for the Ninth Circuit

---

AMY THOMAS-LAWSON; BRENDA BOLEY; MIGUEL PADILLA; WILLIAM GREEN,
on behalf of themselves and all those similarly situated,
*Plaintiffs-Appellants*,

v.

CARRINGTON MORTGAGE SERVICES, LLC,
*Defendant-Appellee*.

---

On Appeal from the United States District Court
for the Central District of California
No. 20-cv-7301 (The Hon. Otis D. Wright, II)

---

## BRIEF OF PLAINTIFFS-APPELLANTS

---

Hassan A. Zavareei
Kristen G. Simplicio
TYCKO & ZAVAREEI LLP
1828 L Street, NW, Suite 1000
Washington, DC 20036
(202) 973-0900

Annick M. Persinger
TYCKO & ZAVAREEI LLP
10880 Wilshire Boulevard, Suite 1101
Los Angeles, CA 09924
(213) 425-3657

Patricia M. Kipnis
BAILEY & GLASSER LLP
923 Haddonfield Road, Suite 300
Cherry Hill, NJ 08002
(856) 324-8219

Deepak Gupta
Linnet Davis-Stermitz
GUPTA WESSLER PLLC
2001 K Street, NW, Suite 850 North
Washington, DC 20006
(202) 888-1741
*deepak@guptawessler.com*

James L. Kauffman
BAILEY & GLASSER LLP
1055 Thomas Jefferson Street, NW
Suite 540
Washington, DC 20007
(202) 463-2101

October 14, 2021                    *Counsel for Plaintiffs-Appellants*

# TABLE OF CONTENTS

Table of authorities ................................................................ iii

Introduction .......................................................................... 1

Jurisdictional statement ........................................................ 3

Statement of the issues ......................................................... 3

Pertinent statutory text ........................................................ 4

Statement of the case ........................................................... 4

    A.    Statutory background ......................................... 4

    B.    Regulatory background ........................................ 8

    C.    Factual background ............................................ 11

    D.    Procedural background ..................................... 13

Summary of argument .......................................................... 16

Standard of review ............................................................... 20

Argument ............................................................................. 20

    I.    The plain text of the FDCPA forecloses debt collectors from imposing extra fees on consumers through contracts other than the original agreements creating the debt. ................................ 21

        A.    By its text and structure, § 1692f(1) specifies when and how a contract may authorize the collection of an "amount." ............................................. 22

        B.    Nothing in the text of the "permitted by law" exception authorizes the collection of an "amount" specified in some separate contract between a debt collector and a consumer. ................................. 26

C.    The agencies tasked with interpreting the FDCPA, together with the majority of federal courts, have arrived at the same conclusion. .................................................. 33

D.    The policy arguments to the contrary are unavailing. ............. 36

E.    Applied here, this interpretation of § 1692f(1) requires reversal and remand on each of the plaintiffs' claims. .............. 41

II.    Even if debt collectors could justify extra pay-to-pay fees by imposing their own new contracts on consumers, that would be an affirmative defense—and the district court erred in imposing on the plaintiffs the burden to plead its negation. ............... 42

A.    The ordinary rule is that the party seeking to claim the benefit of an exception to the prohibition of a statute bears the burden of pleading, and ultimately proving, that it is so entitled. .................................................. 43

B.    The "permitted by law" exception is an affirmative defense on which Carrington bears the burdens of pleading and proof. .................................................. 45

1.    The text and history of the FDCPA show that whether an amount is "permitted by law" is an affirmative defense. ........................................ 45

2.    The debt collector is best positioned to establish that an enforceable contract was formed or to point to legal authority supporting its fees. .................... 48

Conclusion ................................................................... 50

# TABLE OF AUTHORITIES

## Cases

*Advocate Health Care Network v. Stapleton,*
    137 S. Ct. 1652 (2017) .................................................. 23, 24, 32

*Ali v. Federal Bureau of Prisons,*
    552 U.S. 214 (2008) ........................................................... 22, 40

*Artichoke Joe's California Grand Casino v. Norton,*
    353 F.3d 712 (9th Cir. 2003) .................................................... 29

*Bailey v. United States,*
    516 U.S. 137 (1995) ................................................................. 23

*BedRoc Ltd. v. United States,*
    541 U.S. 176 (2004) ............................................................... 22

*Big Lots Stores, Inc. v. Jaredco, Inc.,*
    182 F. Supp. 2d 644 (S.D. Ohio 2002) ..................................... 6

*Bostock v. Clayton County,*
    140 S. Ct. 1731 (2020) ........................................................... 37

*BP P.L.C. v. Mayor & City Council of Baltimore,*
    141 S. Ct. 1532 (2021) ..................................................... 18, 37

*Builders Bank v. Oreland, LLC,*
    2015 WL 1383308 (C.D. Cal. Mar. 23, 2015) ........................ 33

*Burdon Cent. Sugar Refining Co. v. Payne,*
    167 U.S. 127 (1897) ............................................................... 26

*Campbell v. MBI Associates, Inc.,*
    98 F. Supp. 3d 568 (E.D.N.Y. Mar. 31, 2015) ....................... 41

*Campidoglio LLC v. Wells Fargo & Co.,*
    870 F.3d 963, 970 (9th Cir. 2017) ....................................... 20

*Central Bank of Denver, N.A. v. First Interstate Bank of Denver, N.A.,*
    511 U.S. 164 (1994) .......................................................... 27, 31

*Christopher v. SmithKline Beecham Corp.*,
567 U.S. 142 (2012) ............................................................. 32

*Clark v. Capital Credit & Collection Services, Inc.*,
460 F.3d 1162 (9th Cir. 2006).........................................25, 47

*Concrete Pipe & Products of California v. Construction Laborers Pension*
*Trust for Southern California*,
508 U.S. 602 (1993) ............................................................48

*Del Campo v. American Corrective Counseling Services, Inc.*,
718 F. Supp. 2d 1116 (N.D. Cal. June 3, 2010).................31, 47

*Diaz v. Kubler Corp.*,
785 F.3d 1326 (9th Cir. 2015) ..............................................31

*Dixon v. United States*,
548 U.S. 1 (2006)................................................................44

*Doe v. Internet Brands, Inc.*,
824 F.3d 846 (9th Cir. 2016) ...............................................20

*Equal Employment Opportunity Commission v. Kamehameha Schools/Bishop Estate*,
990 F.2d 458 (9th Cir. 1993) ...............................................44

*Estate of Campbell v. Ocwen Loan Servicing, LLC*,
2020 WL 5104538 (S.D. Fla. Apr. 30, 2020) ....................... 40

*Evankavitch v. Green Tree Servicing, LLC*,
793 F.3d 355 (3d Cir. 2015) ...........................19, 43, 46, 48

*Facebook, Inc. v. Duguid*,
141 S. Ct. 1163 (2021) ........................................................29

*Federal Communications Commission v. NextWave Personal Communications, Inc.*,
537 U.S. 293 (2003) ........................................................... 27

*Federal Land Bank of St. Paul v. Bismarck Lumber Co.*,
314 U.S. 95 (1941)............................................................ 40

*Flores v. Collection Consultants of California*,
2015 WL 4254032 (C.D. Cal. Mar. 20, 2015).................40, 47

iv

*FMC Corp. v. Holliday,*
  498 U.S. 52 (1990) ........................................................ 27

*Foley v. Interactive Data Corp.,*
  765 P.2d 373 (Cal. 1988) ................................................. 24

*Fusco v. Ocwen Loan Servicing, LLC,*
  2020 WL 2519978 (S.D. Fla. Mar. 2, 2020) ......................... 35

*Gross v. FBL Financial Services, Inc.,*
  557 U.S. 167 (2009) ...................................................... 22

*HCSC-Laundry v. United States,*
  450 U.S. 1 (1981) ......................................................... 25

*Hernandez v. Williams, Zinman & Parham PC,*
  829 F.3d 1068 (9th Cir. 2016) ........................................... 22

*In re Sterten,*
  546 F.3d 278 (3d. Cir. 2008) ............................................. 48

*Jemzura v. Jemzura,*
  330 N.E.2d 414 (N.Y. 1975) ............................................. 24

*Kingdomware Technologies, Inc. v. United States,*
  136 S. Ct. 1969 (2016) .................................................... 22

*Lembeck v. Arvest Central Mortgage Co.,*
  498 F. Supp. 3d 1134 (N.D. Cal. 2020) .......................... 35, 37, 41

*Lewis v. Quality Coal Corp.,*
  270 F.2d 140 (7th Cir. 1960) ............................................. 33

*Lish v. Amerihome Mortgage Co.,*
  2020 WL 6688597 (C.D. Cal. Nov. 10, 2020) ..................... 36, 37, 40

*Long v. United States,*
  199 F.2d 717 (4th Cir. 1952) ............................................. 30

*Lusnak v. Bank of America, N.A.,*
  883 F.3d 1185 (9th Cir. 2018) ............................................ 44

*Maronyan v. Toyota Motor Services, U.S.A., Inc.*,
    658 F.3d 1038 (9th Cir. 2011) ............................................... 42

*McCormick v. 7-Eleven*,
    2009 WL 10704103 (N.D. Tex. Mar. 24, 2009) ........................... 34

*McCullough v. Johnson, Rodenburg & Lauinger, LLC*,
    637 F.3d 939 (9th Cir. 2011) ........................................... 19, 46

*McFadden v. Nationstar Mortgage LLC*,
    2021 WL 3284794 (D.D.C. 2021) .......................................... 35

*McWhorter v. Ocwen Loan Servicing, LLC*,
    2017 WL 3315375 (N.D. Ala. Aug. 3, 2017) ............................... 35

*Meghrig v. KFC Western, Inc.*,
    516 U.S. 479 (1996) ..................................................... 31

*Morales v. Trans World Airlines, Inc.*,
    504 U.S. 374 (1992) ..................................................... 25

*Osorio v. State Farm Bank, F.S.B.*,
    746 F.3d 1242 (11th Cir. 2014) ........................................... 48

*Pipiles v. Credit Bureau of Lockport, Inc.*,
    886 F.2d 22, 27 (2d Cir. 1989) ........................................... 38

*Quinteros v. MBI Associates, Inc.*,
    999 F. Supp. 2d 434 (E.D.N.Y. 2014) ..................................... 38

*R.M. Perlman, Inc. v. New York Coat, Suit, Dresses, Rainwear & Allied Workers'*
    *Union Local 89-22-1, I.L.G.W.U., AFL-CIO*,
    33 F.3d 145 (2d Cir. 1994) ............................................... 33

*RadLAX Gateway Hotel, LLC v. Amalgamated Bank*,
    566 U.S. 639 (2012) ..................................................... 26

*Retired Employees Ass'n of Orange County, Inc. v. County of Orange*,
    266 P.3d 287 (Cal. 2011) ................................................. 24

*Richardson v. National City Bank of Evansville*,
    141 F.3d 1228 (7th Cir. 1998) ........................................... 40

*Rumsey Indian Rancheria v. Wilson,*
    64 F.3d 1250 (1994) ............................................................ 29

*Schaffer ex rel. Schaffer v. Weast,*
    546 U.S. 49 (2005) ........................................................ 43, 44

*Schwarm v. Craighead,*
    552 F. Supp. 2d 1056 (E.D. Cal. 2008) .............................. 47

*Simmet v. Collection Consultants of California,*
    2016 WL 11002359 (C.D. Cal. July 7, 2016) .................... 41

*Smith v. Berryhill,*
    139 S. Ct. 1765 (2019) ...................................................... 22

*Smith v. United States,*
    133 S. Ct. 714 (2013) .................................................... 48, 49

*Torliatt v. Ocwen Loan Servicing, LLC,*
    2020 WL 1904596 (N.D. Cal. Apr. 17, 2020) .................... 41

*Tuttle v. Equifax Check,*
    190 F.3d 9 (2d Cir. 1999) .............................................. 31, 36

*United States Commodity Futures Trading Commission v. Monex Credit Co.,*
    931 F.3d 966 (9th Cir. 2019) ............................ 19, 43, 44, 50

*United States v. E.I. Dupont De Nemours & Co.,*
    432 F.3d 161 (3d Cir. 2005) ............................................ 48

*United States v. First City National Bank of Houston,*
    386 U.S. 361 (1967) .................................................. 18, 44, 45

*United States v. Franchi-Forlando,*
    838 F.2d 585 (1st Cir. 1988) .......................................... 46

*United States v. Johnson,*
    529 U.S. 53 (2000) .......................................................... 25

*United States v. Launder,*
    743 F.2d 686 (9th Cir. 1984) .......................................... 28

*West v. Costen,*
  558 F. Supp. 564 (W.D. Va. 1983) ..............................................28, 31, 35

**Statutes**

14 U.S.C. § 1903 .................................................................................. 32

15 U.S.C. § 1692(e) ............................................................................. 38

15 U.S.C. § 1692a(6) .............................................................................. 7

15 U.S.C. § 1692b(3) ........................................................................... 46

15 U.S.C. § 1692f ............................................................................... 4, 7

15 U.S.C. § 1692f(1) ...................................................................... *passim*

15 U.S.C. § 1692k(d) .............................................................................. 3

15 U.S.C. § 1692*l*(d) .............................................................................. 9

15 U.S.C. § 719g(a) .............................................................................. 31

15 U.S.C. § 719g(c) .............................................................................. 31

18 U.S.C. § 3171(b) ............................................................................. 32

28 U.S.C. § 1291 ................................................................................... 3

28 U.S.C. § 1331 ................................................................................... 3

42 U.S.C. § 10140 ............................................................................... 32

California Civil Code § 1788.14(b) ...................................................... 42

California Civil Code § 1788.17 .......................................................... 42

S. Rep. No. 95-382 (1977) ................................................................. 4, 7

**Rules**

Federal Rule of Appellate Procedure 4(a)(2) ......................................... 3

Federal Rule of Civil Procedure 58(c)(2)(B) ..................................................3

Federal Rule of Civil Procedure 8(c)...............................................19, 43

**Regulatatory Materials**

Consumer Financial Protection Bureau, *Compliance Bulletin 2017-01: Phone Pay Fees*, 82 Fed. Reg. 35,936 (Aug. 2, 2017)...................................*passim*

Federal Trade Commission, *Statement of General Policy or Interpretation Staff Commentary On the Fair Debt Collection Practices Act*, 53 Fed. Reg. 50,097 (Dec. 13, 1988) ...................................................................*passim*

*Fees and charges after endorsement*, 24 C.F.R. § 203.552 (2021) .........................42

**Other Authorities**

1 Williston on Contracts § 1.6 (4th ed.).......................................................24

*Black's Law Dictionary* (11th ed. 2019) ..........................................................28

William Blackstone, *Commentaries on the Laws of England* (1769)....................................44

Jake Halpern, *Pay Up, A Debt Collector Struggles to Stay Out of Debt*, The New Yorker (Oct. 11, 2010)............................................................7

*Merriam-Webster's Ninth New Collegiate Dictionary* (1986) ................................28

*New Oxford American Dictionary* (3d ed 2010) ............................................28

Richard A. Posner, *Economic Analysis of the Law* (7th ed. 2007)..................................49

Richard A. Posner, *The Economics of Justice* (1981) ......................................48

Restatement (Second) of Contracts § 4 cmt. a (1981)..................................24

Antonin Scalia & Bryan A. Garner, *Reading Law: The Interpretation of Legal Texts* (2012)............................................................30, 40

*The Debt Collection Practices Act: Hearing on H.R. 11969 Before the Subcommittee on Consumer Affairs of the House Committee on Banking, Finance, and Urban Affairs*, 94th Cong. (1976)............................................................5, 6, 39

*The Debt Collection Practices Act: Hearing on H.R. 29 Before the Subcommittee on Consumer Affairs of the House Committee on Banking, Finance, and Urban Affairs*, 95th Cong. (1977) ................................................................. 5, 6

# INTRODUCTION

When it enacted the Fair Debt Collection Practices Act in 1977, one of the collection abuses that Congress aimed to stop was the common practice of seeking to collect not just a consumer's original debt with a creditor, but any extra charges that third-party debt collectors thought they could get away with tacking on—often by inducing consumers into new agreements to pay additional collection fees.

To that end, Congress flatly prohibited debt collectors from collecting or attempting to collect "any amount (including any interest, fee, charge, or expense incidental to the principal obligation) unless such amount is expressly authorized by the agreement creating the debt or permitted by law." 15 U.S.C. § 1692f(1).

The effect of this statutory text—a prohibition, together with two carefully drawn exceptions—is to establish nonwaivable protection for consumers: Collectors may no longer lawfully pursue whatever extra fees they want simply by inducing consumers to agree to those fees. The statute's narrow exceptions only reinforce this strict rule: Consumers may be assessed an amount as a matter of contract—but only if agreed to *ex ante*, at arm's-length with the original creditor, so that the charges are "expressly authorized by the agreement creating the debt." And states (or the federal government) may allow extra charges too—but only if those charges are expressly "permitted by law." Thus, debt collectors require pre-existing legal authority to collect any amount from a consumer; they can't create their own.

In line with this text, federal regulators have long held that collectors may not assess extra fees unless they are "expressly authorized" by the contract creating the debt or "expressly permitted" by a state (or federal) law. 53 Fed. Reg. 50,097, 50,107–08 (1988). Lately, these regulators have emphasized that this bar applies to "pay-to-pay" fees, such as those assessed in exchange for payment by phone. 82 Fed. Reg. 35,936, 35,397–98 (2017). The majority of courts agree.

The district court here departed from this consensus view by carving out a new exception, based on the theory that "permitted by law" may mean "allowable as a matter of contract." On this outlier theory, collectors may charge any extra fees they want, including "pay-to-pay" fees, so long as they can successfully induce consumers to agree to a new contract authorizing them.

The statute's text forecloses this approach. By choosing the words "expressly authorized by the agreement creating the debt," Congress specified precisely which contracts could supply the necessary authorization for a fee: those that created the debt in the first place. The district court may as well have taken a red pen to the statute and crossed out those words. If debt collectors could so easily contract out of the careful limits established by Congress, there would have been no point in articulating those limits—or enacting this statute—in the first place.

## JURISDICTIONAL STATEMENT

The district court had jurisdiction under 28 U.S.C. § 1331 and 15 U.S.C. § 1692k(d). The court granted the defendant's motion to dismiss "in its entirety" on April 5, 2021, and directed the clerk to "close this case." ER-16. The plaintiffs filed their timely notice of appeal on May 4, 2021. ER-249–52; *see* Fed. R. Civ. P. 58(c)(2)(B); Fed. R. App. P. 4(a)(2). This Court has jurisdiction under 28 U.S.C. § 1291.

## STATEMENT OF THE ISSUES

The Fair Debt Collection Practices Act prohibits "[t]he collection of any amount (including any interest, fee, charge, or expense incidental to the principal obligation) unless such amount is expressly authorized by the agreement creating the debt or permitted by law." 15 U.S.C. § 1692f(1). Despite this prohibition, some debt collectors routinely charge "pay-to-pay" fees—that is, extra fees imposed for accepting payment by telephone or by other means.

1. **Pay-to-Pay Fees.** May debt collectors impose pay-to-pay fees on consumers through contracts other than the original agreements creating the debt?

2. **Burden.** Even if the statute allows this, did the court err in imposing on the plaintiffs the burden to establish that enforceable contracts existed here?

3. **State-Law Claims.** Did the district err in treating the state-law claims as rising and falling with three plaintiffs' FDCPA claims and, if so, should this Court remand to allow the district court to consider those claims in the first instance?

**PERTINENT STATUTORY TEXT**

**15 U.S.C. § 1692f. Unfair practices**

A debt collector may not use unfair or unconscionable means to collect or attempt to collect any debt. Without limiting the general application of the foregoing, the following conduct is a violation of this section:

**(1)** The collection of any amount (including any interest, fee, charge, or expense incidental to the principal obligation) unless such amount is expressly authorized by the agreement creating the debt or permitted by law.

**STATEMENT OF THE CASE**

**A. Statutory background**

In the mid-1970s, the collection industry was rife with abuse. Largely unregulated, independent debt collectors operated by obtaining unpaid debts from other companies and pursuing repayment of those debts at all costs. Because these collectors were third parties in the business of trying to collect amounts that consumers had *already* agreed to pay different, initial creditors, they weren't "restrained by the desire to protect their good will" with consumers. S. Rep. No. 95-382, at 2 (1977), *reprinted in* 1977 U.S.C.C.A.N. 1695, 1696. Meanwhile, they "generally operate[d] on a 50-percent commission." *Id.* The combined effect was a troubling "incentive": to collect as much as possible "by any means." *Id.* "The general idea," former collectors told a congressional subcommittee convened to consider the issue, "was to generate an aura of fear and doubt in the mind of the debtor"—to "fool[]"

him, in other words, into "thinking that the wolf was right outside his door with a master key." *The Debt Collection Practices Act: Hearing on H.R. 29 Before the Subcomm. on Consumer Affs. of the H. Comm. on Banking, Fin., and Urb. Affs.*, 95th Cong. 30 (1977).

Few tactics were too unsavory. To pursue debts they had acquired, some debt collectors would make endless, harassing phone calls. *The Debt Collection Practices Act: Hearing on H.R. 11969 Before the Subcomm. on Consumer Affs. of the H. Comm. on Banking, Fin., and Urb. Affs.*, 94th Cong. 31, 34 (1976); *id.* at 45–46. Others would misrepresent who they were, claiming to be representatives of the IRS or deputy sheriffs with orders of repossession in hand. *See id.* at 31, 33, 51. They would threaten debtors that failure to repay might cost them their homes or retirement benefits, lead to expensive legal action, or land them in jail. *Hearing on H.R. 29*, 95th Cong. at 28–31; *Hearing on H.R. 11969*, 94th Cong. at 31–32, 51. Or they might even threaten bodily harm—from telling a debtor they could end up "floating face down in the river" to stealing their crutches. *Hearing on H.R. 11969*, 94th Cong. at 28; *Hearing on H.R. 29*, 95th Cong. at 336 (reports of urging debtor to put "put[] her son up for adoption, go[] to welfare, put[] her mother out of the house, or if nothing worked, kill[] herself").

The purpose and effect of this relentless barrage was to get consumers to pay up as quickly as possible. *Hearing on H.R. 11969*, 94th Cong. at 24. For many debt collectors, that created a golden opportunity to tack on whatever extra charges they could dream up to boost their commissions. "Just put whatever you think you can

get on the bills," the industry figured, and it would be "just that much more for us." *Id.* at 46. That could mean everything from "tack[ing] interest" on a bill "capriciously," *id.*, to making the *debtor* pay charges for the collectors' relentless phone calls, *Hearing on H.R. 29*, 95th Cong. at 352.

These charges were limited only by collectors' imaginations—and they could significantly increase the size of a debtor's bill. *See id.* (tacking $10 of "interest" onto a $25 doctor's bill); *see also id.* at 63, 65 (tacking $6 in "repeat billing" and "court" costs onto $16 bill); *id.* at 72–73 (facing additional $114 collection charges on top of $300 debt). And consumers often agreed to pay them—not as the result of a fair, arm's-length bargaining process, but because it felt like the only way to resolve the debt they were being hounded over. *See id.* at 75, 88 (consumer acknowledging that, though it "may have been a mistake," he'd agreed to pay an additional $300 "interest or service charge" to try to resolve an outstanding $2,500 debt); *id.* at 244 (observing that "the common practice of arbitrarily adding additional costs to the [debtor's] account" usually entails charges that are "not authorized by law and are paid only because the debtor" doesn't think they can refuse).

Debt collectors still attempt these tactics today. *See, e.g.*, *Big Lots Stores, Inc. v. Jaredco, Inc.*, 182 F. Supp. 2d 644, 647 (S.D. Ohio 2002) (debt collector told consumer "she owed $193.10 for her original $68.10 check" and "threatened her with arrest if she did not pay"); Jake Halpern, *Pay Up, A Debt Collector Struggles to Stay Out of Debt*,

The New Yorker (Oct. 11, 2010) (discussing examples of unsavory tactics, from threatening debtors with sexual abuse to telling debtors their children would be "handed over to social-services agencies").

But now it is more difficult to get away with it. That is because, faced with evidence of this barrage of abuses, Congress in 1977 enacted the Fair Debt Collection Practices Act. In that Act, Congress focused on the behavior of independent debt collectors—those "third persons who regularly collect debts for others," not the creditors with whom a consumer took on an initial obligation. S. Rep. 95-382 at 3; *see also* 15 U.S.C. § 1692a(6) ). (defining this term). This was because Congress specifically worried that those who collect debt for *others* face no "incentive" to protect "the consumer's opinion of them." S. Rep. 95-382 at 2–4.

Setting out to alter that equation, Congress in the FDCPA barred these third-party collectors from using "unfair or unconscionable means to collect or attempt to collect any debt." 15 U.S.C. § 1692f. And it then listed a nonexhaustive set of prohibited practices. First among them was the problem described above: "The collection of any amount (including any interest, fee, charge, or expense incidental to the principal obligation) unless such amount is expressly authorized by the agreement creating the debt or permitted by law." *Id.* § 1692f(1).

## B.    Regulatory background

The regulators tasked with authoritatively interpreting the FDCPA have consistently read § 1692f(1) to embody a rule in line with its text: Debt collectors may not collect any amount—unless that amount is expressly authorized by the original contract creating the debt or expressly permitted by a state law.

The Federal Trade Commission, for one, has long held that a debt collector may attempt to collect extra charges only in two situations: when (a) the contract creating the debt "expressly provide[s]" for a charge and that charge "is not prohibited by state law," or (b) when that contract is silent "but the charge is otherwise expressly permitted by state law."[1] FTC, *Statements of General Policy or Interpretation Staff Commentary on the Fair Debt Collection Practices Act*, 53 Fed. Reg. 50,097, 50,108 (Dec. 13, 1988). So, conversely, a debt collector is prohibited from imposing such a charge if (a) state law "expressly prohibits" its collection—or (b) if "the contract does not provide for collection of the amount and state law is silent." *Id.* Whether state (or, presumably, federal) law permits a charge, in other words, depends on what it says about a particular type of charge. If such a statute thereby

---

[1] The FDCPA does not say, in so many words, that the "authorized by the agreement" provision of § 1692f(1) requires that an amount be "not prohibited" by law. But the FTC appears to have reasoned that that requirement must be present by implication: After all, a contract can't authorize something that a statute prohibits. Nor does the FDCPA refer specifically to "state" law; the FTC appears to have adopted that focus because state statutes will usually be the source of law.

"permits collection of reasonable fees, the reasonableness (and consequential legality) of these fees is determined by state law." *Id.*

Meanwhile, the Consumer Financial Protection Bureau—the agency now tasked with rulemaking on debt collection issues, *see* 15 U.S.C. § 1692*l*(d)—has directed its enforcement activities at a range of abuses relating to tacking fees onto consumer debt. In particular, it has recently devoted close attention to "pay-to-pay" fees—that is, fees that companies assess in exchange for accepting a consumer's payment of a particular debt. Many companies, the agency has noted, have begun charging these sorts of fees in exchange for accepting payments over the phone or via an online portal. *See* CFPB, *Compliance Bulletin 2017-01: Phone Pay Fees*, 82 Fed. Reg. 35,936, 35,936 (Aug. 2, 2017).

Pay-to-pay fees pose numerous problems. For instance, the agency has explained, many companies charge different pay-to-pay fees depending on what type of payment method a consumer selects—but never bother to tell consumers about the price differences among the available options. *Id.* at 35,937. Others fail to inform consumers that the purpose of a particular fee is to process the consumer's payment immediately—and that the consumer could make a payment by just the same method at no expense, so long as they were willing to wait for the payment to post. *See id.* (entity gave delinquent credit-card holders "the false impression that they had to pay $14.95 to make payment by phone when, in fact, the sole purpose of that fee

was to expedite phone payments"). And still others give the false impression that there is no service fee at all, when in fact they have quietly added that amount to the amount due. *Id.*

Much of this conduct, the CFPB has warned, violates consumer financial protection laws. To begin with, in the agency's view, pay-to-pay fees frequently run afoul of the Dodd-Frank Act's prohibition on engaging in unfair, deceptive, or abusive acts or practices. *Id.* at 35,396–97. And, when it comes to debt collection, the fees often violate federal law for an even simpler reason, too: Unless they are "expressly authorize[d]" by the instrument creating the "underlying debt" or applicable state law "expressly permit[s] collecting such fees," they are squarely prohibited by the plain text of § 1692f(1) of the FDCPA. *See id.* at 35,397–98.

Most state Attorneys General, along with the U.S. Department of Justice, have echoed these concerns. In one recent case alleging that the mortgage servicer PHH had assessed "convenience" fees, 33 Attorneys General emphasized that such pay-to-pay fees are often "excessive, unnecessary[,] and likely illegal"—a source of profits to debt collectors and minimal benefits to consumers. *See Morris v. PHH Mortg. Corp.*, No. 20-CV-60633, Brief of Amicus Curiae States Attorneys General, Dkt. No. 118-2 at 1 (S.D. Fla. Jan. 29, 2021). In its own filing on behalf of the United States, DOJ expressed a similar view. *See Morris v. PHH Mortg. Corp.*, No. 20-CV-60633, Statement of Interest of the United States, Dkt. No. 126 at 6 n.3 (S.D. Fla. Mar. 3, 2021).

## C.    Factual background

The defendant here, Carrington Mortgage Services, LLC, is a large residential mortgage servicer. ER-217. Ostensibly, its business model is to collect mortgage debts by obtaining servicing rights for mortgage loans that homeowners obtained elsewhere and receiving its own compensation out of the interest paid on each borrower's monthly payment. ER-217–18, 223, 225.

But, unsatisfied with that regime, the company came up with a plan to collect more: charge each borrower an extra $5 whenever they tried to make an online payment, and an extra $10 or $20 whenever they tried to pay by phone. ER-217, 223. Because the processing system that Carrington used charged the company fifty cents—or less—per transaction, Carrington was able to pocket the difference, making at least $4.50 (or $19.50) every time a consumer submitted a phone or online payment. ER-217–18, 223.

That is what happened to the plaintiffs here. Plaintiffs-appellants Amy Thomas-Lawson, William Green, and Brenda Boley each obtained a loan secured by a mortgage in their respective states of Maryland, New York, and Texas. ER-219, 224–25, 227, 228. But after they each fell behind on their mortgage payments and their loans fell into default, Carrington acquired the servicing rights to those loans and started charging them $5 every time they submitted a mortgage payment using its online system and as much as $20 to pay by phone. ER-225, 227–29. Plaintiff-appellant

Miguel Padilla had a similar experience with the mortgage on his home in California. ER-230. Though he never fell behind on his mortgage, Carrington acquired it too, and began charging him the same pay-to-pay fees. ER-230–31.

The plaintiffs' mortgage agreements were supposed to protect them against just these sorts of charges. The mortgages Ms. Thomas-Lawson, Mr. Padilla, and Mr. Green obtained, for instance, were each Federal Housing Administration Mortgages. ER-223. That meant they were governed by uniform covenants that strictly regulated their terms—including prohibiting lenders from charging fees beyond those authorized by the secretary of the Department of Housing and Urban Development. ER-223–24, 226–28, 231. HUD, in turn, authorized only certain "allowable fees and charges," requiring servicers to request special approval to assess fees not mentioned there—and going so far as to prohibit servicers from charging borrowers for "activities that are normally considered a part of a prudent Mortgagee's servicing activity." ER-224. And though Ms. Boley's mortgage was not an FHA mortgage, her mortgage agreement was just as clear: Nowhere did it authorize pay-to-pay fees. ER-229. Rather, her mortgage agreement expressly prohibited charging fees barred by the mortgage agreement itself or by "Applicable Law," *see* ER-237, while each other plaintiffs' mortgage agreement limited what could become an "additional debt" to amounts "disbursed" by the lender itself, ER-237–41.

But Carrington paid these restrictions no heed and charged the plaintiffs its gratuitous pay-to-pay fees anyway. ER-225–229, 231.

**D.   Procedural background**

The plaintiffs then sued Carrington in federal district court. On behalf of themselves and a nationwide class, Ms. Thomas-Lawson, Ms. Boley, and Mr. Green asserted that Carrington's unauthorized pay-to-pay fees violated the FDCPA's prohibition on "[t]he collection of any amount (including any interest, fee, charge, or expense incidental to the principal obligation) unless such amount is expressly authorized by the agreement creating the debt or permitted by law." ER-234–35; 15 U.S.C. § 1692f(1). And, on behalf of themselves and respective state classes, the plaintiffs asserted related state-law claims—brought by Ms. Thomas-Lawson, Ms. Boley, and Mr. Padilla under the Maryland, Texas, and California debt-collection and consumer-protection laws, respectively, ER-241–47, and brought by all four plaintiffs under each state's respective breach-of-contract law, ER-235–41.

Carrington moved to dismiss each of the claims. As to the FDCPA claim, the company offered up three theories. For one, it asserted, it wasn't a debt collector at all. ER-119–21. Second, its pay-to-pay fees couldn't violate the FDCPA because they weren't "incidental to" the underlying mortgage obligations within the meaning of § 1692f(1). ER-102–03. And third, the company urged that its fees were actually allowed by § 1692f(1). ER-103–04. That is so, the company reasoned, because the

plaintiffs had supposedly entered new, voluntary contracts, either online or by phone, every time they submitted a pay-to-pay fee. *See* ER-89–93, 103–04. To try to establish this point, the company attached to its motion to dismiss various transcripts and screenshots showing a few examples of what consumers heard or saw about the company's fees—or would have found if they had hung up the phone (or scrolled down a payment page) and navigated to terms and conditions buried on its processor's website. *See* ER-115–73, 176, 210–16. According to these filings, consumers paying by phone or online were told that their payment would include a "convenience fee." *See, e.g.*, ER-147, 215. Consumers were not informed that this was a new fee that they had not already agreed to pay. Nor were they told what "convenience" it supplied or whether it was optional or required.

Because, Carrington argued, this scheme created contracts that were enforceable under state contract law, fees collected under those contracts were "permitted by law" within the meaning of § 1692f(1). ER-89–93, 103–04. The company urged dismissal of the plaintiffs' state-law claims on largely similar grounds, adding a variety of separate arguments countering their breach-of-contract claims (that those claims were barred by the "voluntary payment doctrine," that the plaintiffs had not sufficiently alleged Carrington was a party to their deeds of trust, and that HUD regulations could not support their claims). ER-93–98.

The district court rejected Carrington's first FDCPA theory. It acknowledged that the term "debt collector," as it is used the FDCPA, "does not include . . . mortgage servicing companies . . . *unless* the debt was in default at the time" it was assigned. ER-10 (citing 15 U.S.C. § 1692a(6)(F)(iii)). But because the FDCPA plaintiffs *had* alleged that their loans had fallen into default by the time Carrington became their servicer, the court reasoned, they easily pleaded that Carrington was a debt collector—as the company itself told borrowers when it made collection calls. ER-11.

The court disagreed with the second theory too. It acknowledged that some district courts had held that convenience fees weren't "incidental" to a principal obligation within the meaning of § 1692f(1). ER-12. But even if that were right, the court explained, Carrington's argument still failed. As "[m]ost courts" to consider the issue have reasoned, ER-12 (quoting *Torliatt v. Ocwen Loan Servicing, LLC*, 2020 WL 1904596, at *2 (N.D. Cal. Apr. 17, 2020)), § 1692f(1) does not only prohibit such "incidental" amounts—it prohibits the collection of "any" unauthorized "amount," of which incidental charges are but one example, ER-12–13.

The district court was, however, persuaded by the third argument: "[N]othing" in § 1692f(1), in its view, prohibited Carrington from simply "offering to enter into a new contract" with each of the plaintiffs. ER-13–14. "Without going so far as to conclude that Plaintiffs entered into contracts not described in the Complaint," the court placed the onus on them to plead that they had not done so.

ER-13–14. In the district court's view, it was the *plaintiffs* who bore the burden, at the pleading stage, of "establish[ing]" that Carrington's fees were "not permitted by law." ER-14 (emphasis omitted). And the plaintiffs had failed to discharge that burden, such as by pleading the absence of separate contracts or by otherwise negating the possibility that Carrington's fees were "permitted by law." On that basis, the district court dismissed the plaintiffs' FDCPA claims and reasoned that the same logic sufficed to dismiss their state-law claims too. Along the way, it declined to address any of Carrington's alternative arguments.

## SUMMARY OF ARGUMENT

**I.** The text and structure of 15 U.S.C. § 1692f(1) bar debt collectors from collecting a fee when their own contract provides the only basis for doing so.

**A.** By its text, § 1692f(1) sets forth an expansive prohibition on collecting "*any* amount" from consumers. And it follows that prohibition up with two carefully circumscribed exceptions. First, in just one circumstance—when the *initial* "agreement creating the debt" "expressly" says so—it is enough for the "amount" to be authorized only by contract. Alternatively, an amount may be "expressly . . . permitted" by some state or federal law.

Neither of these exceptions allows an "amount" to be collected solely on the basis of a contract between a consumer and a debt collector. The first exception is conspicuously limited to an *earlier* contract formed with the original creditor. And if

the second exception were read to allow the collection of any "amount" authorized by any contract, the first exception would be rendered mere "surplusage"—or, worse, its "expressly" and "creating the debt" limitations would be read out of the statute altogether. Basic statutory interpretation principles forbid that result.

**B.** To disturb this conclusion, something in the text or structure of the "permitted by law" exception would have to unambiguously convey Congress's intent to undermine its own enactment. But nothing does. Contract law may be a form of "law." But when parties collect an "amount" pursuant to a contract, that's because the *contract* "permit[s]" collection—not because contract *law* does. The ordinary meaning and usage of the term "permit," together with the grammatical principle that the modifier "expressly" in fact modifies that term, only emphasize how unlikely it is that Congress intended this result.

**C.** For this reason, the district court has little company. Both the FTC and the CFPB have provided authoritative interpretations of § 1692f(1) that are incompatible with the district court's understanding. *See* 53 Fed. Reg. at 50,108; 82 Fed. Reg. at 35,397–98. And though no court of appeals has considered this question, the majority of district courts have agreed, emphasizing that a fee may be deemed "permitted by law" only when a statute expressly says so—not when a debt collector's contract does.

**D.** Those few courts that have gone the other way have supplied little reasoned analysis. Their logic boils down to the policy argument that debt collectors

offer consumers benefits in exchange for their fees. But "[e]ven the most formidable policy arguments cannot overcome a clear statutory directive." *BP P.L.C. v. Mayor & City Council of Balt.*, 141 S. Ct. 1532, 1542 (2021). And the policy arguments here aren't even good: Debt collectors' charges routinely supply no benefit at all and are simply the result of their superior bargaining position.

The alternative argument that the FDCPA permits these fees because they are not incidental to a consumer's principal obligation also fails: The text of § 1692f(1) does not limit its effect to "incidental" amounts and, in any event, fees paid in order to make a payment on a principal debt *are* incidental to that principal.

**E.** Because the district court relied on this interpretive error to dismiss each of the plaintiffs' claims (including their state-law claims), and because it declined to consider any of the parties' alternative arguments, this Court should reverse and remand.

**II.** Even if the district court were correct that a contract other than the original agreement creating the debt may authorize charging extra fees to collect it, it misapplied its own rule because it wrongly required the *plaintiffs* to negate an affirmative defense.

**A.** The ordinary rule is that a defendant who "claims the benefits of an exception to the prohibition of a statute" bears the burden to establish that the exception applies. *United States v. First City Nat'l Bank of Hous.*, 386 U.S. 361, 366 (1967).

At the pleading stage, this means that the plaintiff need not plead the negation of the defense as an element of their claim; rather, the defendant must plead the defense in its answer, and may only secure dismissal on the pleadings if the defense raises no disputed issues of fact. *U.S. Commodity Futures Trading Comm'n v. Monex Credit Co.*, 931 F.3d 966, 973 (9th Cir. 2019); *see also* Fed. R. Civ. P. 8(c).

**B.** The "permitted by law" exception to § 1692f(1) is such an affirmative defense. The grammatical structure that introduces the exception—clear prohibitory language followed by the word "unless"—is a "telltale sign." *Evankavitch v. Green Tree Servicing, LLC*, 793 F.3d 355, 361–62 (3d Cir. 2015). Understandably, then, this Court's precedent already treats § 1692f(1)'s grammatically parallel "authorized by the agreement" exception this way. *McCullough v. Johnson, Rodenburg & Lauinger, LLC*, 637 F.3d 939, 950 (9th Cir. 2011). And allocating the burden to the debt collector makes sense: As a sophisticated repeat player, *see Evankavitch*, 793 F.3d at 365–68, it is far better positioned to identify what policies or procedures it employed to attempt to form contracts with consumers or to imagine what other legal theories might "permit[]" its conduct. Accordingly, even assuming that the "permitted by law" exception encompasses contractual defenses, the district court erred by placing the burden of establishing that Carrington's fees were not permitted by law on the plaintiffs. This Court need not address this issue, however, if it accepts our primary

argument that § 1692f(1) bars debt collectors from collecting a fee when their own contract provides the only basis for doing so.

## STANDARD OF REVIEW

This Court reviews "de novo the district court's grant of a motion to dismiss under Rule 12(b)(6), accepting all factual allegations in the complaint as true and construing them in the light most favorable to the nonmoving party." *Campidoglio LLC v. Wells Fargo & Co.*, 870 F.3d 963, 970 (9th Cir. 2017) (here, and unless otherwise noticed, all quotations cleaned up). And because the primary question in this appeal concerns statutory interpretation, it is a question of law that is likewise reviewed de novo. *Doe v. Internet Brands, Inc.*, 824 F.3d 846, 850 (9th Cir. 2016).

## ARGUMENT

Section 1692f(1) of the FDCPA prohibits debt collectors from collecting "any amount (including any interest, fee, charge, or expense incidental to the principal obligation) unless such amount is expressly authorized by the agreement creating the debt or permitted by law." 15 U.S.C. § 1692f(1). At issue in this appeal is whether the text and structure of this provision allow a debt collector to collect a pay-to-pay fee on the basis that it has been authorized by some *new* contract between the debt collector and the consumer.

According to all the traditional tools of statutory interpretation, the text of the FDCPA may not be stretched this far, and the district court erred in concluding

otherwise. For that reason alone, the district court should not have dismissed the plaintiffs' complaint. But even if the statute could be so interpreted, the district court still erred: It misapplied its own theory, improperly allocating to the plaintiffs the burden to plead the negation of the defendant's affirmative defense.

## I. The plain text of the FDCPA forecloses debt collectors from imposing extra fees on consumers through contracts other than the original agreements creating the debt.

Congress in the FDCPA said exactly when and how contracts may authorize the collection of an "amount": when the contract creating the debt says so, and says so expressly. But by allowing *any* contract to supply that authorization, the district court invented its own exception, rendering Congress's enacted text superfluous— and erasing altogether the careful limitation that the contract creating the debt *expressly* authorize an amount before a debt collector may collect it. Neither text nor structure allows this. Rather, each statutory exception serves its own distinct function. What is more, read in context, the second, "permitted by law" exception cannot bear the weight the district court placed on it: It calls for identifying an express, or at least a formal, enactment of law authorizing a charge—not for examining the outcome of a private contractual arrangement. So it is no surprise that the regulatory agencies tasked with authoritatively interpreting § 1692f(1) have long rejected the district court's interpretation—as have the majority of courts to confront similar issues. This Court should do the same.

**A.    By its text and structure, § 1692f(1) specifies when and how a contract may authorize the collection of an "amount."**

As with all questions of statutory interpretation, the inquiry here "begins with the statutory text," *BedRoc Ltd. v. United States*, 541 U.S. 176, 183 (2004), and the "assumption that the ordinary meaning of that language accurately expresses the legislative purpose," *Gross v. FBL Fin. Servs., Inc.*, 557 U.S. 167, 175 (2009). In this analysis, the meaning of statutory text does not depend on examining its words "in isolation." *Hernandez v. Williams, Zinman & Parham PC*, 829 F.3d 1068, 1073 (9th Cir. 2016). Rather, this Court looks to "the text itself, the specific context in which that text is used, and the broader context of the statute as a whole." *Id.* When the text "is unambiguous and the statutory scheme is coherent and consistent"—as is the case here—"the inquiry ceases." *Kingdomware Techs., Inc. v. United States*, 136 S. Ct. 1969, 1976 (2016).

By its text, § 1692f(1) begins by setting forth a broad prohibition: Generally speaking, third-party independent debt collectors may not collect "any amount (including any interest, fee, charge, or expense incidental to the principal obligation)" from a consumer. This language is far-reaching. The "word 'any' has an expansive meaning, that is, 'one or some indiscriminately of whatever kind.'" *Ali v. Fed. Bureau of Prisons*, 552 U.S. 214, 219 (2008). Thus, when Congress uses that word, courts understand "an intent to use [it] expansively," not restrictively. *Smith v. Berryhill*, 139 S. Ct. 1765, 1774 (2019). And Congress here used it *twice*: first to note that collecting *any*

amount is prohibited, and then, in its set of examples, to emphasize that Congress meant what it said: "[A]ny amount" includes "*any* interest, fee, charge or expense incidental to the principal obligation." 15 U.S.C. § 1692f. Meanwhile, it used no terms of limitation whatsoever.

Having crafted such a broad prohibition, Congress proceeded to articulate two carefully circumscribed exceptions. First, it explained that private contractual ordering could allow debt collectors to collect an "amount" in one circumstance: When, in the "agreement creating the debt," the consumer and its initial creditor "expressly" authorized that "amount." 15 U.S.C. § 1692f(1). And second, Congress allowed that "law," too, could "permit[]" such an extra charge. *Id.* In other words, the first exception deals with what sort of contracts can authorize the collection of an "amount"—just one—while the second deals with what sorts of enactments of law may have the same effect.

The Supreme Court has long instructed that, when Congress uses "two terms," it does so because it "intended each term to have a particular, nonsuperfluous meaning." *Bailey v. United States*, 516 U.S. 137, 146 (1995). Interpreting the second exception to invoke the operation of contract law, just as the first does, would "run[] aground" on this basic statutory-interpretation principle. *Advoc. Health Care Network v. Stapleton*, 137 S. Ct. 1652, 1659 (2017). Consider first that, if it were true that "permitted by law" could mean merely "*allowable* as a matter of contract," there would be no

reason at all to include the "authorized by the agreement" exception in the statute. To read the second exception as inclusive of the first would be little better than "treat[ing] those words as stray marks on a page—notations that Congress regrettably made but did not really intend." *Id.* And that is forbidden: Courts must "give effect, if possible, to every clause and word of a statute," presuming that "each word Congress uses is there for a reason." *Id.*

Worse still, interpreting the second exception to allow debt collectors to collect any fee they want so long as they can get a consumer to sign an additional side contract would not simply render the first, "authorized by the agreement" exception meaningless—it would draw a red pen right through it. That is because the first exception requires that an amount be *expressly* authorized by the instrument creating the consumer's debt. But contract law enforces some obligations when they are not "expressly" agreed to at all—such as those that follow from contracts implied in fact or quasi-contracts implied in law. *See* 1 Williston on Contracts § 1.6 (4th ed.); Restatement (Second) of Contracts § 4 cmt. a (1981); *see also, e.g.*, *Ret. Emps. Ass'n of Orange Cty., Inc. v. County of Orange*, 266 P.3d 287, 290 (Cal. 2011) ("The distinction" between an express and an implied contract "reflects no difference in legal effect but merely in the mode of manifesting assent."); *Foley v. Interactive Data Corp.*, 765 P.2d 373, 385 (Cal. 1988) ("[I]mplied-in-fact contract terms ordinarily stand on equal footing with express terms."); *Jemzura v. Jemzura*, 330 N.E.2d 414, 420 (N.Y. 1975) ("A contract

implied in fact may result as an inference from the facts and circumstances of the case, although not formally stated in words, and is derived from the presumed intention of the parties as indicated by their conduct. It is just as binding as an express contract arising from declared intention . . . .").

By allowing debt collectors to collect amounts that the parties *expressly* authorized in the instrument creating the consumer's debt, Congress specified exactly which sorts of contracts were exempted from § 1692f(1): Those contracts that created the debt in the first place, and even then, only when they *expressly* authorized the additional "amount." If Congress had wanted to go further, it would have done so. As this Court has long observed, Congress in drafting the FDCPA made a careful "effort . . . to be both explicit and comprehensive, in order to limit the opportunities for debt collectors to evade the under-lying legislative intention." *Clark v. Cap. Credit & Collection Servs., Inc.*, 460 F.3d 1162, 1178 (9th Cir. 2006).

And more broadly, when "Congress provides exceptions in a statute," the "proper inference" "is that Congress considered the issue of exceptions and, in the end, limited the statute to the ones set forth." *United States v. Johnson*, 529 U.S. 53, 58 (2000). All the more so when, as here, Congress has set forth one general and one more specific exception. That's because "[i]t is a commonplace of statutory construction that the specific governs the general." *Morales v. Trans World Airlines, Inc.*, 504 U.S. 374, 384 (1992); *see also HCSC-Laundry v. United States*, 450 U.S. 1, 6 (1981) (per

curiam) (the specific governs the general "particularly when the two are interrelated and closely positioned, both in fact being parts of [the same statutory scheme]"). Yet allowing the first, more specific exception to § 1692f(1) to be "swallowed" by the second, more general one flouts this basic principle. *RadLAX Gateway Hotel, LLC v. Amalgamated Bank*, 566 U.S. 639, 645 (2012). Interpreting the "permitted by law" exception to mean "allowable as a matter of contract law" would undermine these careful drafting choices—not only rendering the "expressly authorized" exception unnecessary, but writing its limits out of the statute altogether. This Court should reject that invitation. An "interpretation" is "incorrect" when it "would obliterate one portion" of the text "in order to enforce another." *Burdon Cent. Sugar Ref. Co. v. Payne*, 167 U.S. 127, 142 (1897).

**B.** **Nothing in the text of the "permitted by law" exception authorizes the collection of an "amount" specified in some separate contract between a debt collector and a consumer.**

For the "permitted by law" exception to disturb this understanding, something in its text or structure would have to unambiguously convey Congress's intent to undo its own enactment. But every statutory clue suggests otherwise.

For starters, on its face, the "permitted by law" exception has nothing to say about contracts at all. It refers to what is permitted by "law," not what is permitted by contract. For the exception to do more, the logic seems to be that "contract law" is a sort of law. But that doesn't get us very far. That's because "contract law" has

nothing to say about an "amount" one party might want to collect from another. For it to "permit" that amount, then, there must first be a *contract* that does so—and the only role contract law plays is to supply the background principles that specify how, and whether, that allowance may be enforced. So the district court's logic requires an odd inference: When it specified that an "amount" must be "permitted by law," Congress really meant that "a contract allowing the collection of an amount" was so permitted.

This would be a curious way to achieve this result in any statute. But it is particularly illogical when, in the *immediately preceding statutory text*, Congress showed it "knew how" to approve contractual arrangements by plain, straightforward language "when it chose to do so." *Cent. Bank of Denver, N.A. v. First Interstate Bank of Denver, N.A.*, 511 U.S. 164, 177 (1994). All the more so when reading "permitted by law" to refer to general contracting would undermine altogether Congress's earlier language. "If Congress had intended such an irrational result, surely it would have expressed it in straightforward English." *FMC Corp. v. Holliday*, 498 U.S. 52, 66 (1990) (Stevens, J., dissenting); *see also FCC v. NextWave Pers. Commc'ns, Inc.*, 537 U.S. 293, 302 (2003) (disapproving interpreting text to create an exception when doing so would both allow the exception to "consume the rule" and depart from the "clear[] and express[]" way Congress normally created such an exception).

Everything else about the "permitted by law" exception is consistent with the reading that that exception does not allow the invocation of separate consumer-collector contracts. Consider the word "permit." The ordinary meaning of that term is "to consent to expressly or formally" or "to give leave"; to "authorize." *Merriam-Webster's Ninth New Collegiate Dictionary* (1986); *see also Black's Law Dictionary* (11th ed. 2019) ("[t]o consent to formally; to allow (something) to happen, esp. by an official ruling, decision, or law"); *New Oxford American Dictionary* (3d ed 2010) (to "give authorization or consent to (someone) to do something"; to "authorize or give permission for (something)"). "Permission," in other words, "requires an affirmative authorization, not just indulgent silence." *West v. Costen*, 558 F. Supp. 564, 582 (W.D. Va. 1983). To "permit" something thus is distinct from allowing, tolerating, or failing to prohibit it.

To be sure, the word "permit"—like any English word—will inevitably take on different meanings in different statutory contexts. In *United States v. Launder*, for instance, this Court considered the following criminal statute: "[W]hoever, having kindled . . . a fire in or near any forest" on federal land "leaves said fire without totally extinguishing the same, or *permits or suffers* said fire to burn or spread beyond his control," shall pay certain penalties. 743 F.2d 686, 688 (9th Cir. 1984) (emphasis added) (quoting 18 U.S.C. § 1856). In that context, it would make no sense to read "permits or suffers" to require formal authorization to let a fire burn out of control. Meanwhile, elsewhere, the word "permit" has even been found either ambiguous or

unambiguous, depending on the issue presented, in the exact same statutory phrase. *Compare Artichoke Joe's Cal. Grand Casino v. Norton*, 353 F.3d 712, 722 (9th Cir. 2003) (holding that the phrase "permits such gaming" in the Indian Gaming Regulatory Act, while it "does not necessarily require an affirmative act of legal authority," is "susceptible to more than one interpretation") *with Rumsey Indian Rancheria v. Wilson*, 64 F.3d 1250, 1257 (1994) (relying on *Launder* to find the same phrase unambiguous in the same statute).

But in *this* statutory context, it does not make sense to interpret "permit[]" to mean merely allowable as a matter of contract. For a "law" to "permit[]" an "amount," that law must say something somewhat specific about that amount—not, as in the case of contract law, merely supply background principles explaining how parties can establish their own private orderings.

Moreover, on close inspection, the statute actually *says* that the permission must be express—and thereby forecloses reliance on the implicit effects of contract law. Under the "conventional rules of grammar," "when there is a straightforward, parallel construction that involves all nouns or verbs in a series," a modifier at either the beginning or the end of the list "normally applies to the entire series." *Facebook, Inc. v. Duguid*, 141 S. Ct. 1163, 1169 (2021) (quoting Scalia & Garner, *Reading Law: The Interpretation of Legal Texts* 147 (2012)). "This canon generally reflects the most natural reading of a sentence." *Id.* A statute, for instance, that penalizes someone who

"forcibly assaults, resists, opposes, impedes, intimidates, or interferes with" another most naturally reads—and accordingly has been interpreted—to apply the modifier "forcibly" to each word in the list. *See Long v. United States*, 199 F.2d 717, 719 (4th Cir. 1952).

The same is true here: by permitting the collection of an amount "expressly authorized by the agreement creating the debt or permitted by law," § 1692f(1), under the series-modifier canon, applies the modifier "expressly" to *both* statutory exceptions—requiring a clear statement before either the parties' initial contract or some enactment of law may allow collection. True, syntax may occasionally "suggest" that "no carryover modification" is appropriate. Scalia & Garner, *Reading Law* at 148. But that's typically accomplished by using a "determiner" like *a*, *the*, or *some* before the second element—or by rephrasing or reordering the elements to limit the items to which the modifier may apply. *See id.* at 148–49. Congress employed none of those methods here—and so "expressly" carries over to modify both verbs in the clause. Indeed, this is just how the FTC has long interpreted the statute—and the CFPB too. *See* 53 Fed. Reg. at 50,108; 82 Fed. Reg. at 35,397–98.

For an "amount" to be "permitted by law" within the meaning of § 1692f(1), then, there must be a law that expressly—or, even if the series-modifier canon were disregarded, at least formally or officially—authorizes the "amount." Various state laws do just this. For instance, California's Bad Check Diversion Act permits district

attorneys (or companies contracting with them) to collect bad-check processing fees and bank charges up to statutorily specified amounts. *See Del Campo v. Am. Corrective Counseling Servs., Inc.*, 718 F. Supp. 2d 1116, 1133 (N.D. Cal. June 3, 2010); *see also, e.g.*, *Tuttle v. Equifax Check*, 190 F.3d 9, 11–12 (2d Cir. 1999) (describing similar Connecticut law); *West*, 558 F. Supp. at 582 (similar Virginia law). And California similarly authorizes prejudgment interest up to a specified interest rate—and specifies that it may be recovered from "any [] debtor." *See Diaz v. Kubler Corp.*, 785 F.3d 1326, 1328–30 (9th Cir. 2015). State contract law, by contrast, does not measure up.

Were there any remaining doubt, Congress does not generally use the phrase "permitted by law" to capture anything having to do with contracts. *See Cent. Bank of Denver*, 511 U.S. at 176–77 (interpreting a statutory phrase by examining uses of the phrase elsewhere in the U.S. Code); *Meghrig v. KFC W., Inc.*, 516 U.S. 479, 485 (1996) (similar). Rather, throughout the U.S. Code, Congress has *routinely* used "permitted by law" in contexts that do not connote looking to the outer bounds of what contract law might allow—indeed, in contexts where it would make no sense to consider contractual arrangements at all.

Take just a few examples. In 15 U.S.C. § 719g(a), for instance, Congress authorized granting certain "certificates, permits, rights-of-way, leases, and other authorizations." The statute then specifies that those approvals "may include terms and conditions permitted by law," with certain exceptions. *Id.* at § 719g(c). If any term

or condition could be deemed "permitted by law" simply because it was included in the resulting contract, and because *that* contract was permitted by law, the phrase "permitted by law" would have no meaning at all. But that cannot be. *See Christopher v. SmithKline Beecham Corp.*, 567 U.S. 142, 163 (2012) (rejecting interpretations that render "statutory language meaningless"); *Advoc. HealthCare Network*, 137 S. Ct. at 1660 (similar).

Or consider 18 U.S.C. § 3171(b), which makes funds available to the Administrative Office of the U.S. Courts. In doing so, it allows those funds to be "expended for personnel, facilities, and any other purpose permitted by law." That limitation would be meaningless, too, if it all it required was the formation of contracts. And just the same is true throughout the U.S. Code: Time and again, the statutory phrase "permitted by law" would make no sense in context if it were interpreted to include actions merely allowed by contract law. *See, e.g.*, 42 U.S.C. § 10140 (permitting waste disposal authorizations to be granted that "shall include such terms and conditions . . . required by law, and may include terms and conditions permitted by law"); 14 U.S.C. § 1903 (Board of Visitors to Coast Guard Academy "shall be reimbursed, to the extent permitted by law, by the Coast Guard for actual expenses incurred while engaged in duties as a member or adviser").

And this is just how contracting parties use the term, too—to refer specifically to *non*-contractual sources of authority. *See, e.g.*, *R.M. Perlman, Inc. v. N.Y. Coat, Suit,*

*Dresses, Rainwear & Allied Workers' Union Local 89-22-1, I.L.G.W.U., AFL-CIO*, 33 F.3d 145, 157 (2d Cir. 1994) (interpreting "permitted by law" as a savings clause that looked to the legal environment *outside* the labor dispute clause); *Lewis v. Quality Coal Corp.*, 270 F.2d 140, 142 (7th Cir. 1960) (similar); *Builders Bank v. Oreland, LLC*, 2015 WL 1383308, at *3 (C.D. Cal. Mar. 23, 2015).

All this only bolsters the plain textual reading of the rest of the statutory scheme that we explained *supra* Part I.A. Even if the outer bounds of the "permitted by law" exception remain unclear, the broader statutory structure in which that provision is embedded forecloses the conclusion that, by including that exception in the statute, Congress intended to capture private contracts.

### C.   The agencies tasked with interpreting the FDCPA, together with the majority of federal courts, have arrived at the same conclusion.

It is thus unsurprising that the federal agencies tasked with enforcing the FDCPA have read § 1692f(1) to set forth two distinct exceptions—neither of which approves debt collectors' inducing consumers to form new contracts, long after they entered their initial obligation, to pay some new "amount[s]."

The FTC, for instance, has long interpreted § 1692f(1) to mean that debt collectors may collect a charge only it is "expressly authorized" by the contract creating the debt or, if that contract is silent on that point, if the charge is "expressly permitted" by a state law. 53 Fed. Reg. at 50,108. Neither of these exceptions embrace

separate contracts between consumers and debt collectors. Instead, by reading "expressly" to modify "permitted," the FTC plainly envisioned some specific enactment—not the background operation of contract law.

And the CFPB has explained that pay-to-pay fees are exactly the sorts of "amount[s]" the statute prohibits—noting with particular concern debt collectors' growing efforts to evade the two plain exceptions in the statute. 82 Fed. Reg. at 35,397–98. What's more, like the FTC, it has explained that pay-to-pay fees may *only* be collected if they are "expressly authorize[d]" by the instrument creating the underlying debt or applicable state law "expressly permit[s] collecting such fees." Some private contract reached with a debt collector is manifestly insufficient.

The majority of courts to consider this question have settled on this same plain-meaning construction too. *See, e.g.*, *McCormick v. 7-Eleven*, 2009 WL 10704103, at *1 (N.D. Tex. Mar. 24, 2009) ("Defendants may impose a service charge only "(i) if the customer expressly agrees to the charge in the contract creating the debt, or (ii) the charge is expressly permitted by law."). They have thereby rejected the suggestion that debt collectors can secure extra fees by obtaining their own contracts. Rather, pay-to-pay fees violate § 1692f(1) *except* when the instrument creating the debt or some state law specifically authorizes them. *See Morris v. PHH Mortg. Corp.*, No. 20-60633-Civ-Smith, Statement of Interest of the United States at 6 n.3 (S.D. Fla. Mar.

3, 2021) ("A majority of courts to address the issue agree that such conduct violates the FDCPA." (citing cases)).

These courts have reasoned that an "amount" is only "permitted by law" within the meaning of § 1692f(1) and similar state statutes if it is authorized by "some state or federal statute or regulation." *Lembeck v. Arvest Cent. Mortg. Co.*, 498 F. Supp. 3d 1134, 1136–37 (N.D. Cal. 2020). As Judge Chhabria has explained, it would "beg[] the question" to suppose that contract law can supply this needed "permi[ssion]"; after all, the whole "point" of § 1692f(1) "is to prohibit certain kinds of contracts, just as minimum wage laws, child labor laws, and antitrust laws prohibit other kinds of contracts." *Id.*; *see also, e.g.*, *West*, 558 F. Supp. at 582.

This does not necessarily mean, courts addressing this issue have explained, that the "law" authorizing a particular "amount" must explicitly "use the term 'Speedpay fee' or even describe the precise mechanism by which the fees are charged." *Fusco v. Ocwen Loan Servicing, LLC*, 2020 WL 2519978, at *3 (S.D. Fla. Mar. 2, 2020). But it must, at least, "make clear that" the collection of the particular amount "is permitted by law." *Id.*; *see also McFadden v. Nationstar Mortg. LLC*, 2021 WL 3284794, at *5 (D.D.C. 2021) ("The word 'permitted' requires" the plaintiff to identify some "statute which 'permits' . . . the fees or charges in question."); *McWhorter v. Ocwen Loan Servicing, LLC*, 2017 WL 3315375, at *7 (N.D. Ala. Aug. 3, 2017) (same). And, though no circuit court has addressed this question, the Second Circuit has suggested there

is at least "some force" to the argument that a charge can only be "permitted by law" if a statute affirmatively authorizes it (before declining to decide the issue). *Tuttle*, 190 F.3d at 13.

This Court should follow this same logic. It should hold that neither the text and structure of § 1692f(1), nor the statutory language of the "permitted by law" exception, authorizes a debt collector to charge whatever fees it likes—and thereby avoid the FDCPA's limitations entirely—so long as it can induce a consumer to enter a new contract approving them.

### D. The policy arguments to the contrary are unavailing.

In breaking from this consensus, the district court offered little reasoned analysis. It instead simply asserted that "nothing" in the FDCPA barred Carrington "from offering to enter into a new contract with the debtor" for "the added convenience of paying by phone," ER-13–14—quoting another district court's thin analysis in doing so, *see Lish v. Amerihome Mortg. Co.*, 2020 WL 6688597, at *8 (C.D. Cal. Nov. 10, 2020). But neither the district court, nor the scant authorities in agreement, have given any explanation for this conclusion at all—let alone one that grappled with the plain text of the FDCPA or identified errors in the foregoing reasoning.

At most, they settle on two related points, neither of which is persuasive. First, they have said that, because the FDCPA doesn't "*require[]* collection compan[ies] to accept payments" by phone, "nothing" in the FDCPA prohibits them from entering

new contracts requiring consumers to pay for that "convenience." *Id.*, at *8 (quoting *Meintzinger v. Sortis Holdings, Inc.*, 2019 WL 1471338, at *2 (E.D.N.Y. Apr. 3, 2019)). But that does not follow. The reason the FDCPA prohibits debt collectors from adding new charges to consumer accounts has nothing to do with how debt collectors accept consumer payments. It's the statutory text: Section 1692f(1) says they can't do so—unless either the instrument creating the debt or some preexisting state law expressly authorizes as much.

Second, these courts' ultimate concern seems to be one of policy: Consumers, the logic goes, benefit from the "convenience" of phone or online payments—and so it doesn't "serve consumer-protective purposes" to apply the FDCPA to prohibit charging extra for them. *See Lembeck*, 498 F. Supp. 3d at 1136 (explaining, and then rejecting, this view). But this is wrong too. For starters, "[e]ven the most formidable policy arguments cannot overcome a clear statutory directive." *BP P.L.C.*, 141 S. Ct. at 1542. As the Supreme Court has explained over and over, when the meaning of a statute's terms is plain, a court's "job is at an end. The people are entitled to rely on the law as written." *Bostock v. Clayton County*, 140 S. Ct. 1731, 1749 (2020). No "contentions about what [debt collectors] think the law was meant to do, or should do, allow [this Court] to ignore the law as it is." *Id.* at 1745; *see also Lembeck*, 498 F. Supp. 3d at 1136 ("[W]here a transaction falls so obviously within the plain language of the statute, the possibility that Congress wouldn't have intended the result is not

relevant."). All the more so for a statute like the FDCPA, a strict-liability statute where, given that it is "clear that Congress painted with a broad brush" to "protect consumers from abusive and deceptive debt collection practices," "courts are not at liberty to excuse violations where the language of the statute clearly comprehends them." *Pipiles v. Credit Bureau of Lockport, Inc.*, 886 F.2d 22, 27 (2d Cir. 1989).

And these policy arguments are wrong anyway. The FDCPA was expressly drafted not just to penalize unscrupulous debt collectors, but also "to insure that those debt collectors who refrain from using abusive debt collection practices are not competitively disadvantaged." 15 U.S.C. § 1692(e). Even if the fees imposed here are not the most "egregious" examples of misconduct the FDCPA penalizes, the statute's "plain instruction" that debt collectors may only collect them with clear authorization makes sense as a means of moderating debt collectors' behavior. *Quinteros v. MBI Assocs., Inc.*, 999 F. Supp. 2d 434, 438 (E.D.N.Y. 2014). And allowing debt collectors to do whatever they please so long as they enter their own contracts with consumers would work an end-run around the FDCPA's statutory text, opening the door to the abuses that predated—and precipitated—it.

Moreover, as the CFPB has explained, pay-to-pay fees are not mere convenience fees. Debt collectors frequently fail to inform consumers of either the existence of a fee or of the option for lower-cost alternatives. *See* 82 Fed. Reg. at 35,937. Others misleadingly brand pay-to-pay fees as "processing fees" when the fees

are much larger than any cost of "processing." 82 Fed. Reg. at 35,937. Both sorts of problems may even be present here. *See* ER-215 (Carrington failing to tell consumers of alternatives); ER-217–18, 223 (plaintiffs pleading large windfalls to Carrington). And these practices echo the disturbing testimony Congress heard before enacting the FDCPA, including countless examples of debt collectors' tacking "whatever" extra charges they thought they could get away with onto consumers' bills, figuring that the pressure to resolve a debt would allow them to collect "just that much more" for themselves. *Hearing on H.R. 11969*, 94th Cong. at 46; *see also supra* at 6–9. It is hardly surprising—or somehow not "consumer-protective"—that the text of § 1692f(1) responds to exactly this concern by ensuring that consumers pay an fee only when additional safeguards are in place: That "amount" was either disclosed *ex ante* in the contract creating the debt, or expressly authorized by a state (or federal) law. Indeed, if an amount may be deemed "permitted by law" whenever a debt collector can use its superior bargaining position to persuade a consumer to sign some new contract once their debt has already been incurred, those safeguards would hardly protect consumers at all.

Perhaps in light of these logical problems, most courts that reached the district court's ultimate conclusion—that the FDCPA permits pay-to-pay fees—have not adopted its contract-based theory at all. Rather, they have reasoned that pay-to-pay fees don't violate the FDCPA because they are not "incidental" to a consumer's

principal obligation. *See Flores v. Collection Consultants of Cal.*, 2015 WL 4254032, at *10 (C.D. Cal. Mar. 20, 2015); *see also, e.g.*, *Lish*, 2020 WL 6688597, at *3; *Est. of Campbell v. Ocwen Loan Servicing, LLC*, 2020 WL 5104538, at *2 (S.D. Fla. Apr. 30, 2020).

But this argument makes no sense either. By its plain text, the FDCPA prohibits "[t]he collection of *any* amount" not expressly authorized by the instrument creating the debt or permitted by law, "*including* any interest, fee, charge, or expense incidental to the principal obligation." 15 U.S.C. § 1692f(1) (emphasis added). The statute thereby does not limit its reach to "incidental" amounts, but rather lists those items as *examples* of the "amount[s]" collectors are barred from requiring. After all, as explained above, the word "any" has an expansive meaning. *Ali*, 552 U.S. at 219. And the term "including" has a distinct meaning from "limited to" or "compris[ing]"—it "connotes simply an illustrative application of the general principle." *Fed. Land Bank of St. Paul v. Bismarck Lumber Co.*, 314 U.S. 95, 100 (1941); *see also Richardson v. Nat'l City Bank of Evansville*, 141 F.3d 1228, 1232 (7th Cir. 1998) ("include" is often a term of illustration, not limitation); Scalia & Garner, *Reading Law* at 132 ("The verb *to include* introduces examples, not an exhaustive list."); *id.* at 132 n.1 ("The word *include* . . . usually suggests that the component items are not being mentioned in their entirety. If [instead they are], it would be better to write . . . 'were'; or, if there is an irresistible urge for a fancy word, to use *comprised.*" (quoting Theodore M. Bernstein, *The Careful Writer: A Modern Guide to the English Usage* 228 (1965))).

What is more, even if this statutory-interpretation logic could somehow be justified, pay-to-pay fees typically *are* "incidental" to a consumer's principal obligation—because "[t]he only plausible reading of . . . 'incidental' in this context is as a reference to something that is connected to," but ultimately "far less significant than," the "underlying debt"—an interpretation that describes a typical pay-to-pay fee "well." *Lembeck*, 498 F. Supp. 3d at 1136. After all, "there would be no reason to pay the fee but for the need to pay the principal obligation." *Id.* Just as a fee paid at the airport to upgrade from "economy" to "premium economy" is "incidental" to an earlier flight purchase, a fee paid to submit a payment in some new fashion is incidental to the earlier debt that required the consumer to make payments in the first place. *See id.*

For these reasons, the significant majority of district courts—even including the district court here—have rejected the contrary logic. *See, e.g., id.*; *Torliatt v. Ocwen Loan Servicing, LLC*, 2020 WL 1904596, at *2 (N.D. Cal. Apr. 17, 2020); *Simmet v. Collection Consultants of Cal.*, 2016 WL 11002359, at *2 (C.D. Cal. July 7, 2016); *Campbell v. MBI Assocs., Inc.*, 98 F. Supp. 3d 568, 582 (E.D.N.Y. Mar. 31, 2015).

### E. Applied here, this interpretation of § 1692f(1) requires reversal and remand on each of the plaintiffs' claims.

The district court's error interpreting § 1692f(1) underlay its dismissal of each of the plaintiffs' claims—including their state-law claims, which the district court

erroneously believed all rose or fell with the FDCPA claims. *See* ER-14–15.[2] And the district court did not consider any of the parties' alternative arguments. Because this Court is "a court of review, not first view," *Maronyan v. Toyota Motor Servs., U.S.A., Inc.*, 658 F.3d 1038, 1043 n.4 (9th Cir. 2011), the Court should reverse the district court's dismissal of each of the plaintiffs' claims and remand so that the district court may consider them in the first instance both on their own and in light of the proper interpretation of § 1692f(1).

## II. Even if debt collectors could justify extra pay-to-pay fees by imposing their own new contracts on consumers, that would be an affirmative defense—and the district court erred in imposing on the plaintiffs the burden to plead its negation.

Even if the district court were correct that a contract other than the original agreement creating the debt may justify extra fees, its dismissal of the plaintiffs'

---

[2] That included Mr. Padilla's Rosenthal Act claim, which encompasses violations of three separate and independent provisions of that Act. While one such provision, California Civil Code § 1788.17, references the FDCPA and presented parallel issues of interpretation to § 1692f(1), the other two provisions do not. In particular, Mr. Padilla brings a claim under California Civil Code § 1788.14(b), which prohibits collecting "the whole or any part of the debt collector's fee or charge for services rendered . . . except as permitted by law." Because a pay-to-pay fee is plainly a "charge for services rendered," the district court erred in grouping this violation with the general FDCPA violations. The district court likewise erred in rejecting the plaintiffs' breach of contract claims in full on the grounds that the fees did not violate the FDCPA. ER-14–15. That is because three of the plaintiffs had HUD mortgages, which required that any fees assessed be authorized by the HUD Secretary. The district court did not consider that these fees are not so authorized, and rather are prohibited, by the relevant regulatory scheme. *See* Fees and charges after endorsement, 24 C.F.R. § 203.552 (2021).

complaint was still in error. That's because the district court never even considered whether the pleadings established the existence of pay-to-pay contracts that were enforceable under state law. Instead, it faulted the plaintiffs for failing to plead the *absence* of such contracts. *See* ER-14. As a matter of basic civil procedure, that approach is forbidden. *See* Fed. R. Civ. P. 8(c). The statutory text of § 1692f(1) establishes that the "permitted by law" exception is an affirmative defense. So it was Carrington, not the plaintiffs, who bore the burden of showing that it applied. Accordingly, even if this Court concludes that § 1692f(1) authorizes imposing fees via new, *ex post* contractual arrangements, it still should reverse and remand—so that the district court may consider in the first instance whether the pleadings establish the existence of such contracts here.

A.   **The ordinary rule is that the party seeking to claim the benefit of an exception to the prohibition of a statute bears the burden of pleading, and ultimately proving, that it is so entitled.**

The ordinary rule is that the burden of proof—and, at the pleadings stage, the burden of adequately pleading a plausible claim—falls on the plaintiff. *Schaffer ex rel. Schaffer v. Weast*, 546 U.S. 49, 56 (2005); *U.S. Commodity Futures Trading Comm'n*, 931 F.3d at 973. That is because it's "the plaintiff who generally seeks to change the present state of affairs," and "who therefore naturally should be expected to bear the risk" of failing to adequately plead their claims—or of any subsequent "failure of proof or persuasion." *Evankavitch*, 793 F.3d at 361 (quoting 2 McCormick on Evid. § 337 (7th ed.

2013)). But the flip side of this rule is that one who "claims the benefits of an *exception to the prohibition of a statute*" bears the burden to establish that that exception applies. *First City Nat'l Bank of Hous.*, 386 U.S. at 366; *see also EEOC v. Kamehameha Schs./Bishop Est.*, 990 F.2d 458, 460 (9th Cir. 1993). At the pleading stage, that burden is typically discharged by "affirmatively stat[ing] any avoidance or affirmative defense" in compliance with Federal Rule of Civil Procedure 8(c). *See Lusnak v. Bank of Am., N.A.*, 883 F.3d 1185, 1194 n.6 (9th Cir. 2018); *U.S. Commodity Futures Trading Comm'n*, 931 F.3d at 973.

The principle that those who seek to benefit from a statutory exemption bear the burden of proof it is not new; "at common law," the burden of proving "all circumstances of justification, excuse, or alleviation" rested on the party seeking to benefit from them—most often, the defendant. *Dixon v. United States*, 548 U.S. 1, 8 (2006); *see also* 4 W. Blackstone, *Commentaries on the Laws of England* 201 (1769). Indeed, this "longstanding convention is part of the backdrop against which Congress writes laws." *U.S. Commodity Futures Trading Comm'n*, 931 F.3d at 973. So this Court has emphasized that it must "respect it unless" it has "compelling reasons to think that Congress meant to put the burden of persuasion on the other side." *Id.*; *see also Schaffer*, 546 U.S. at 56–57 (where a statute's plain text is "silent on the allocation of the burden," the defendant bears the burden on elements that "can fairly be characterized as affirmative defenses or exemptions").

**B.** **The "permitted by law" exception is an affirmative defense on which Carrington bears the burdens of pleading and proof.**

Here, every relevant consideration favors leaving the burden with the defendant. The text, structure, and history of § 1692f(1) in particular and the FDCPA in general all suggest that whether an amount was permitted by law is an affirmative defense—not a defense the plaintiffs are somehow obligated to negate in their pleading. And the parties' relative positions lead to the same inevitable conclusion: A debt collector is much better positioned than an unsophisticated consumer to make out a theory that an amount it wants to collect is "permitted by law"—particularly where it depends on a contract theory.

**1.** **The text and history of the FDCPA show that whether an amount is "permitted by law" is an affirmative defense.**

Start with the FDCPA's text and structure. Both show that whether an amount was "permitted by law" is an affirmative defense that the plaintiffs were not required to negate in their pleading.

For starters, § 1692f(1) makes plain that prohibiting collection of "any amount" "is the norm," and allowing that collection is "the exception." *First City Nat'l Bank*, 386 U.S. at 366. That is because it begins with clear prohibitory language barring third-party debt collectors from collecting "any amount"—and follows that prohibition up with the word "unless" and two distinct exceptions. This is the classic

language of the affirmative defense. *See United States v. Franchi-Forlando*, 838 F.2d 585, 591 (1st Cir. 1988) (Breyer, J.) (where portions of a statute are introduced "with the words 'unless' and 'except,'" "defendants may have to treat them as affirmative defenses"). Indeed, the Third Circuit has relied on the identical "telltale" construction—in a provision of the FDCPA with the same structure as this one—to allocate the burden of establishing a statutory exception to the debt collector. *Evankavitch*, 793 F.3d at 362; *id.* ("Any debt collector communicating with any person other than the consumer for the purpose of acquiring location information about the consumer shall . . . not communicate with any such person more than once *unless* requested to do so by such person . . . ." (emphasis in original) (quoting 15 U.S.C. § 1692b(3))).

Perhaps for this reason, this Court has already held that the burden to establish an exception under section 1692f(1) lies with the defendant. In *McCullough v. Johnson, Rodenburg & Lauiniger, LLC*, 637 F.3d 939 (9th Cir. 2011), this Court considered the proof available at summary judgment on the statute's first, "authorized by the agreement" exception. In doing so, it did not ask what evidence the *plaintiff* had introduced. Instead, it held the defendant to the "burden" of providing such evidence, explaining that it "failed to meet its burden . . . because it presented no admissible evidence of a contract authorizing a fee award." *Id.* at 950. Because the two exceptions are introduced by the same grammatical structure, it makes no

difference that *McCullough* considered only the first exception. Its approach extends equally to the second.

And this Court is not alone: District courts routinely require FDCPA defendants seeking to benefit from either of the § 1692f(1) exemptions to prove they are so entitled. *See Schwarm v. Craighead*, 552 F. Supp. 2d 1056, 1080 (E.D. Cal. 2008) ("To establish that a particular fee does not violate § 1692f(1), the debt collector must identify a state law that authorizes the fee."); *see also, e.g.*, *Flores*, 2015 WL 4254032, at *9; *Del Campo*, 718 F. Supp. 2d at 1133.

The FDCPA's status as a "remedial" and a strict-liability statute only underscores this conclusion. *Clark.*, 460 F.3d at 1171. Indeed, this Court has in other contexts emphasized that this remedial nature—that the FDCPA was "aimed at curbing what Congress considered to be an industry-wide pattern of and propensity towards abusing debtors"—makes it "logical" for debt collectors, "repeat players likely to be acquainted with the legal standards governing their industry," to "bear the brunt" of a given risk. *Id.*; *see also id.* at 1171–72 ("As we have oft repeated, it does not seem unfair to require that one who deliberately goes perilously close to an area of proscribed conduct shall take the risk that he may cross the line.").

The fact that the FDCPA imposes strict liability has similar implications. One of the purposes of such a strict-liability regime is to shift the costs of rulebreaking to the "potential injurer"—not the "potential victim." Richard A. Posner, *The Economics*

of Justice 200–01, 293 (1981). That includes the transactional costs of pleading and proof. Unsurprisingly, then, courts have often found it appropriate to place the burden on defendants to prove exceptions and defenses under federal strict-liability statutes—from the FDCPA to the Telephone Consumer Protection Act and CERCLA. *See, e.g.*, *Evankavitch*, 793 F.3d at 361–62; *Osorio v. State Farm Bank, F.S.B.*, 746 F.3d 1242 (11th Cir. 2014); *United States v. E.I. Dupont De Nemours & Co.*, 432 F.3d 161, 178 (3d Cir. 2005). The same approach is warranted here.

### 2. The debt collector is best positioned to establish that an enforceable contract was formed or to point to legal authority supporting its fees.

It is likewise "both practical and fair" to place the burden to establish the permitted-by-law defense on the debt collector rather than the consumer. *Smith v. United States*, 133 S. Ct. 714, 720 (2013). After all, the Supreme Court has emphasized that it's "entirely sensible to burden the party more likely to have information relevant to [the matter] with the obligation to demonstrate [those] facts." *Concrete Pipe & Prods. of Cal. v. Constr. Laborers Pension Tr. for S. Cal.*, 508 U.S. 602, 626 (1993). This tracks "what Rule 8(c) is intended to avoid": the possibility that the defendant, by failing to "plead available affirmative defenses in his answer," could occasion "surprise and undue prejudice" for the plaintiff by depriving them of "notice and the opportunity to demonstrate why" an affirmative defense should not succeed. *In re Sterten*, 546 F.3d 278, 285 (3d. Cir. 2008).

And, here, "the informational asymmetry heavily favors the defendant." *Smith*, 133 S. Ct. at 720. Take the contract-formation theory. A debt collector "knows what steps" it took to form contracts with its consumers, including what call scripts it gave its customer service representatives and how it drafted the small print on its website. *Id.* Indeed, "the facts with regard to" whether an enforceable contract was formed will often "lie peculiarly in the knowledge" of the debt collector—not the consumer. *Id.* By contrast, it would be "nearly impossible" for an unsophisticated consumer "to prove the negative"—or, indeed, to *plead* the negative—of such a contract-formation defense. *Id.* at 720–21. And it makes a bad rule: "It would be particularly inefficient to require the plaintiff to anticipate and produce evidence contravening the indefinite number of defenses that a defendant might plead in a given case." Richard A. Posner, *Economic Analysis of the Law* 647 (7th ed. 2007). Likewise to anticipate and plead the negation of any possible contract-formation theory.

Just the same is true of the permitted-by-law exception in general: Relative to an unsophisticated consumer, a repeat-player debt collector, which has the opportunity, means, and incentives to calibrate its behavior to comply with the law as it collects from many different consumers, has a far greater ability to anticipate, understand, and identify laws that "permit" its collection of a particular amount.

\* \* \*

At bottom, then, the text, structure, and relative positions of the parties uniformly demonstrate that the district court erred in requiring the plaintiffs to plead the negation of the defendant's permitted-by-law affirmative defense. To be clear, this Court need not address this issue if it agrees with our position that § 1692f(1) does not authorize predicating fees on new collector-consumer contracts. But if it reaches the opposite conclusion, it still should reverse and remand for consideration of whether the face of the complaint, or any materials properly incorporated by reference therein, warrant dismissal for failure to state a claim, *see U.S. Commodity Futures Trading Comm'n*, 931 F.3d at 973, and, if so, whether leave to amend should be granted.

## CONCLUSION

The district court's judgment should be reversed.

Respectfully submitted,

*/s/ Deepak Gupta*
Deepak Gupta
Linnet Davis-Stermitz
GUPTA WESSLER PLLC
2001 K Street, NW, Suite 850 North
Washington, DC 20006
(202) 888-1741
*deepak@guptawessler.com*

Hassan A. Zavareei
Kristen G. Simplicio
TYCKO & ZAVAREEI LLP
1828 L Street, NW, Suite 1000
Washington, DC 20036

(202) 973-0900

Annick M. Persinger
TYCKO & ZAVAREEI LLP
10880 Wilshire Boulevard, Suite 1101
Los Angeles, CA 09924
(213) 425-3657

Patricia M. Kipnis
BAILEY & GLASSER LLP
923 Haddonfield Road, Suite 300
Cherry Hill, NJ 08002
(856) 324-8219

James L. Kauffman
BAILEY & GLASSER LLP
1055 Thomas Jefferson Street, NW
Suite 540
Washington, DC 20007
(202) 463-2101

October 14, 2021                    *Counsel for Plaintiffs-Appellants*

## STATEMENT OF RELATED CASES

Plaintiffs-appellants are unaware of any cases pending before this Court that are closely related to these issues.

*/s/ Deepak Gupta*
Deepak Gupta

*Counsel for Plaintiffs-Appellants*

**CERTIFICATE OF COMPLIANCE**

This brief complies with the type-volume limitation of Federal Rule of Appellate Procedure 32(a)(7)(B) because this brief contains 12,648 words excluding the parts of the brief exempted by Rule 32(f). This brief complies with the typeface requirements of Rule 32(a)(5) and the type-style requirements of Rule 32(a)(6) because this brief has been prepared in proportionally spaced typeface using Microsoft Word in 14 point Baskerville font.

*/s/ Deepak Gupta*
Deepak Gupta

*Counsel for Plaintiffs-Appellants*

## CERTIFICATE OF SERVICE

I hereby certify that on October 14, 2021, I electronically filed the foregoing brief with the Clerk of the Court for the U.S. Court of Appeals for the Ninth Circuit by using the CM/ECF system. All participants are registered CM/ECF users and will be served by the CM/ECF system.

*/s/ Deepak Gupta*
Deepak Gupta

*Counsel for Plaintiffs-Appellants*